[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-11488
_____

D.C. Docket No. 01-00254-5:CV-3(WDO)

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 31, 2004
THOMAS K. KAHN
CLERK

TIMOTHY D. CARR,

                                        Petitioner-Appellant,

versus

DERRICK SCHOFIELD, Warden
Georgia Diagnostic Prison,

                                        Respondents-Appellees.

_____

Appeal from the United States District Court for the
Middle District of Georgia

_____

(March 31, 2004)

Before EDMONDSON, Chief Judge, BIRCH and MARCUS, Circuit Judges.

BIRCH, Circuit Judge:

    Timothy D. Carr, a Georgia prisoner convicted of murder and sentenced to

death, appeals the district court's denial of his petition for writ of habeas corpus,

brought pursuant to 28 U.S.C. § 2254. On appeal, Carr raises three claims: (1) the prosecution withheld the evidence of his co-defendants' agreements in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), elicited false testimony regarding those agreements, and failed to correct the false impression created by that testimony in violation of Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173 (1959) and Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972); (2) the prosecution made improper and prejudicial remarks during the sentencing phase closing arguments; and (3) Carr's trial counsel failed to adequately investigate and prepare for the sentencing phase. For the following reasons, we find that Carr is not entitled to relief from his conviction or sentence, and AFFIRM the district court's denial of his petition.

## I. BACKGROUND

Carr was convicted of the 1992 murder of Keith Young following a jury trial in Monroe County, Georgia and was sentenced to death in 1994.[1] His conviction and sentence were affirmed on direct appeal. Carr v. State, 480 S.E. 2d 583 (Ga. 1997) ("Carr I"). The following facts were set forth by the Georgia Supreme Court:

---

[1] Carr was also charged with and convicted of theft of Young's vehicle. He was sentenced to twenty years of imprisonment on the motor vehicle charge. Carr v. State, 480 S.E. 2d 583, 587 (Ga. 1997) ("Carr I").

1.  The jury was authorized to find that Carr, his girl friend Melissa Burgeson, and the 17-year-old victim [Young] attended a party on the evening of the crimes, where they all consumed alcohol and used drugs.  Carr and Burgeson discussed robbing the victim at the party.  In the early hours of the following day, Burgeson took the victim's car keys and talked him into letting her drive him home.  Burgeson drove the victim, Carr, and two juveniles to a remote area of south Monroe County in the victim's car.  During the ride, Carr showed one of the juveniles a large knife and whispered that he intended to kill the victim.  Burgeson stopped the car on a dirt road, and when the victim opened the trunk to look for more drugs, Burgeson motioned to Carr to kill him.  Carr grabbed the victim's hair, pulled his head back and slashed his throat.  At Burgeson's urging, Carr stabbed the victim repeatedly and then beat him in the head with a baseball bat.  After Burgeson took the victim's money, Carr and one of the juveniles dragged the victim's body to the roadside, leaving him to die from his injuries.

Carr and Burgeson fled to Tennessee in the victim's car and were arrested following a high speed chase.  After receiving medical treatment at a local hospital, they were placed in the back of a police car in which police had activated a hidden tape recorder.  Their recorded conversation, in which Carr admitted killing the victim, was introduced into evidence at Carr's trial.  The jury was also authorized to find from the evidence that the knife used to stab the victim was discovered in Burgeson's purse.

The evidence adduced was sufficient to enable a rational juror to find Carr guilty of the crimes charged beyond a reasonable doubt.

Id. at 587 (internal footnote omitted).[2]  During the trial, Carr was represented by court-appointed counsel  Harold Martin and Michael Dillon.

---

[2] Burgeson was also convicted of malice murder and was sentenced to life in prison. Id. at 587 n.2.

Carr then sought habeas corpus relief in the Superior Court of Butts County, Georgia. Following an evidentiary hearing, the court denied the petition as to Carr's conviction but granted the petition and vacated his death sentence on 23 June 2000. R2-10, Ex. Vol. 27, Ex. 63 at 1. The court found that Carr's trial counsel's errors "prejudiced the defense" and that Carr was "denied a trial whose result [was] reliable as to the sentence." Id. at 27. The state appealed, and the Georgia Supreme Court reversed the trial court and reinstated Carr's death sentence on 19 March 2001. Carr v. Head, 544 S.E. 2d 409 (Ga. 2001) ("Carr II"). The Supreme Court of the United States denied Carr's petition for writ of certiorari. Carr v. Head, 534 U.S. 905, 122 S. Ct. 238 (2001) ("Carr III").

Carr next filed an application for writ of habeas corpus in the United States District Court for the Middle District of Georgia. After briefing, but without an evidentiary hearing, the district court denied the petition, denied Carr's motion to alter or amend, and denied Carr's application for a certificate of appealability ("COA"). We granted a COA on three issues: "(1) the alleged Caldwell violation; (2) the alleged Brady/Giglio/Napue violation; and (3) the ineffective assistance of counsel during the penalty phase of his trial claim."[3] R2-30 at 2.

---

[3] Although we initially denied Carr's application and Carr's motion for reconsideration, we later construed Carr's petition for rehearing en banc and/or application to the court en banc for a COA as a petition for rehearing and subsequently granted a COA.

4

## II. DISCUSSION

A. Standard of Review

Our review of a state court's judgment in a habeas corpus proceeding is governed by a "highly deferential standard of review for factual determinations made by a state court." Fugate v. Head, 261 F.3d 1206, 1215 (11th Cir. 2001), cert. denied, 535 U.S. 1104, 122 S. Ct. 2310 (2002). The state court's determinations are "presumed to be correct" and the applicant bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. (quoting 28 U.S.C. § 2254(e)(1)). Further, we can grant federal habeas relief only where the state court's decision

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The state court's decision is "contrary to" if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000). A state court's decision that applies the law as determined by

5

the Supreme Court to the facts is not "contrary to" whether or not the federal court would have reached a different result. Fugate, 261 F.3d at 1216. The state court's decision is an objectively "unreasonable application" if it "identifies the correct governing [Supreme Court] legal principle . . . but unreasonably applies that principle to the facts," Williams, 529 U.S. at 413, 120 S. Ct. at 1523, or "refus[es] to extend the governing legal principle to a context in which the principle should have controlled." Ramdass v. Angelone, 530 U.S.156, 166, 120 S. Ct. 2113, 2120 (2000).

B. The alleged *Brady* or *Giglio* violation

Carr argues that the state's failure to disclose its agreements not to try the juvenile co-defendants, Anthony Lee Dawley and Monica Symonds, as adults in exchange for their testimony violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). He also maintains that the prosecution violated Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972) and Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173 (1959) by eliciting and leaving uncorrected Dawley's and Symonds's testimony that they had received no benefits or lenient treatment in exchange for their testimony. He contends that, although the state court correctly applied the correct law, it failed to consider all of the evidence.

1. Testimony Given During Symonds' and Dawley's Proceedings

6

Shortly after the murder, statements were taken from Symonds and Dawley by Monroe County investigator Ricky Speir.[4] In each statement, Speir asked Symonds and Dawley whether they had been threatened or promised anything in exchange for their statements, and Symonds and Dawley each responded "[n]o." R2-10, Ex. Vol. 16, Ex. 48 at 2560, 2580. Symonds and Dawley were jointly tried in juvenile court about one month later. One of Carr's attorneys attended the trial.

During the trial, Symonds's counsel questioned Symonds regarding her earlier statement to Speir concerning the crimes. Symonds then corrected "some things in that statement." R2-10, Ex. Vol. 22, Ex. 55 at 4657. Specifically, she changed her earlier statement that Dawley had handed the baseball bat to Carr to say that Burgeson had handed the bat to Carr. Dawley testified that he did not assist Carr in any way, and had not touched anything except the knife. He explained that, when Burgeson gave Carr the bat, Carr handed Dawley the knife and Dawley then handed the knife to Burgeson. Dawley was asked whether he had understood that he was not required to talk to the officers, but could remain silent, and he responded that he "understood it very well" and spoke freely because he "was going to tell him the truth about everything." Id. at 4694.

---

[4] Symonds' statement was recorded on 11 October 1992 in the presence of her father. Dawley's statement was recorded on 12 October 1992 in the presence of Monroe County, Georgia investigator Robert Jones and Juvenile Court Services Officer Rhonda Moody.

7

At Dawley's sentencing in 1992, his trial attorney, James Finley Brown, Jr.,

testified:

> He was made no promises by the District Attorney's Office or
> anybody else in exchange for whatever cooperation he gave them.
> And, I know that, because I was his lawyer from the beginning. His
> testimony was–He had already talked to the police officers. I . . .was
> appointed after that. And, he talked to them and gave them the
> statement that he did. He has been consistent throughout his talking
> with either myself or any of the other authorities in the case. I feel
> like he has been as straightforward as he can about it. . . . I know his
> participation was done without any promises, in other words. He did
> what he did to tell what happened.

R2-10, Ex. Vol. 23, Ex. 58 at 5313.

2. Testimony Given During Burgeson's Trial

During Burgeson's trial, Symonds and Dawley admitted that they had talked

to the prosecution, but each again responded "[n]o" when asked whether they had

been promised anything or hoped to gain a benefit in exchange for their testimony.

R2-10, Ex. Vol. 23, Ex. 57 at 4919-20, 5114-15. Symonds, however, testified that

she did not remember who got the bat out of the vehicle. She acknowledged that

her statements regarding the bat differed when she talked to Speir and during her

trial, and explained that she testified differently because she "was trying to help

[Dawley] get his murder charge off." Id. at 4965-66.

8

Dawley similarly acknowledged that he had first said that Burgeson handed him the bat and had then admitted that he handed the bat to Carr, and explained that he made the first statement in an attempt to keep himself out of trouble. Dawley was asked whether the Flint [County] Judicial District Attorney, Tommy Floyd, had testified on his behalf during his sentencing, and responded that he did not remember. Floyd interrupted and explained that he "did go to that hearing. . . . I went there and I did not testify particularly on Mr. Dawley's behalf. I testified to the juvenile judge that Mr. Dawley was cooperating with law enforcement, that he had made a statement, and that I expected to use him as a witness." Id. at 5158.

3. Carr's Trial and Habeas Proceedings

Carr sought production of all favorable evidence during discovery, including whether any witnesses had agreed to testify in exchange for beneficial treatment from the state. At Carr's trial, after Symonds said that she had been found guilty of all charges except for murder, she was asked whether "the State ma[d]e any deals with [her] in exchange for [her] testimony" such as not prosecuting her "on any other charges," and she answered "No." R2-10, Ex. Vol. 5, Ex. 11 at 1369. Symonds also answered "[n]o" when asked whether she remembered who got the bat out of the car, and explained that, although she had testified during her trial that Burgeson retrieved the bat and gave it to Dawley to

9

hand to Carr, her earlier testimony was "not true." Id. at 1420-21. At Carr's trial, Dawley testified that he was found guilty of the murder, but was not convicted of armed robbery or motor vehicle theft, and was sentenced by the juvenile court. When the prosecutor asked whether Dawley was "promised anything" or "given any lenient treatment" in exchange for his testimony or whether he was testifying in hopes of receiving a benefit from the state, Dawley answered "No, sir." Id. at 1432-33.

Before the state habeas hearing, Carr deposed Floyd. When Floyd was asked whether Dawley's and Symonds's attorneys approached him about a plea, he answered that "the deal was I would leave them in juvenile court, they would be charged with what they were charged with. They would be tried in juvenile court. Whatever they got they got and they testified, that was the deal." R2-10, Ex. Vol. 25, Ex. 59D at 18. Floyd answered "No" when asked if most judges would move a juvenile defendant charged with murder to "adult court" but confirmed that he could have gotten Dawley and Symonds transferred. Id. at 19-20. He explained that he left them in juvenile court in order to leave sentencing "up to the Judge" and thought it might be better "from a credibility stand point" because of how "a jury would view" concessions received in exchange for their agreement to testify. Id. at 22-23. Dawley's and Symonds's credibility was important to Floyd because

10

"without . . . their testimony, [the state] would have a very weak . . . , but not impossible case" against Carr and Burgeson. R2-10, Ex. Vol. 23, Ex. 58 at 5308.

During the state habeas proceedings, Carr presented the testimony of his trial attorney, Martin; Dawley; Dawley's defense attorney, Brown; and Floyd.

Martin stated in his affidavit that he believed Dawley's testimony was "critical" since Dawley was the only eyewitness to the assault and had no "effective way to impeach his testimony" other than minor inconsistencies. R2-10, Ex. Vol. 18, Ex. 50 at 2999-3000. He explained that he considered "the issue of any deal between Dawley and the State" as "futile" based on Dawley's testimony at both Burgeson and Carr's trials, and Floyd's statement as to his participation at Dawley's sentencing during Burgeson's trial. Id. at 3000. He stated that he would have used the information of an agreement between Dawley and Floyd in his "cross-examination of Dawley" and that "[i]t would have had a major impact on [his] ability to discredit the State's case, impeach Dawley's credibility, and to raise doubts in the jurors' minds as to who did what to [] Young, and about [Carr's] state of mind at the time." Id. at 3002-03. Martin believed that with it, he "could have cast serious doubt on Dawley's portrayal of [Carr] as a cold, calculating murderer who acted with malicious intent and who forced

11

Dawley to comply with his orders" and "raised serious doubts in the jurors' minds as to whether [Carr] deserved the death penalty." Id. at 3003.

By affidavit, Dawley stated that he was told that if he cooperated, he "would not be sent to adult court" and that Floyd would "try to get the judge to go easy" on him. R2-10, Ex. Vol. 17, Ex. 49 at 2865. Dawley said that Floyd then told the judge "off the record" that Dawley had cooperated. Id. He explained that, although he decided that he did not want to testify against Carr, Floyd made it clear that he "would be in trouble if [he] backed out . . . , and that they would help [him] get out of the [Youth Detention Center] early" if he testified. Id. at 2866.

Brown, Dawley's trial attorney, explained that he and Floyd had an unwritten understanding that Floyd would not move the case to adult court if Dawley testified.[5] Brown said, however, that any agreement was unenforceable and that, if Dawley had refused to testify, there was not "a whole lot Mr. Floyd could have done about it except fuss and carry on." R2-10, Ex. Vol. 10, Ex. 42 at 492. Brown also noted that the decision to proceed in the juvenile court against Dawley and Symonds was made before he was appointed. Martin testified that he

_____

[5] Burgeson's attorneys, Tommy Wilson and P. Benson Ham, also testified that they were unaware of the agreements at the time of the state trials. Wilson said that he was unable to get a statement from either Dawley or Symonds and that he was unaware of the deals, despite having filed a motion requesting disclosure of any deals between the witnesses and the state. Ham commented that, after his attempts to use the prosecutor's favorable comments for Dawley to challenge Dawley's testimony were interrupted by the prosecutor, he did not return to that area of the examination but would have pursued the information of the deals if he had been aware of it during the trial.

was unaware of the agreements and that, if he had known of them, he would have used them to impeach the witnesses at trial.[6]

Floyd was asked whether "there [was] ever a deal" between the juveniles with the state, and answered:

> In the term that you mean deal, no. There was a decision made to leave the cases in juvenile court. That decision had to be made, made very quickly. I frankly don't recall the procedure at that time . . . .
>
> A conversation was had . . . with [Dawley's counsel] because [the state's investigator] wanted to talk to Mr. Dawley some more [because he felt that] . . . Dawley['s] . . . initial statement . . . was incomplete. . . . I told [Dawley's counsel] that Mr. Dawley's case was going to remain in juvenile court, that what happened, I was making no deals as to disposition, that I would make no recommendations as to sentence but at the time of sentencing, I would report to the Court . . . by whatever means w[ere] appropriate at the time, what, if anything, Mr. Dawley was doing, whether he was cooperating, whether he was going to testify, or whether he wasn't.
>
> If that is what you mean by deal. It was not your typical if you do this, I'll do this. I had already done something that was at least irrevocable in my mind, as far as putting them in juvenile court.
>
> The only other thing that came from that was, I will testify that, before the appropriate court as to what his involvement is.

R2-10, Ex. Vol. 10, Ex. 41 at 231-32.

Floyd explained:

> My position today is the way, . . . it has always been. I take issue with the word deal. And I take issue with it for this reason. The

---

[6] Burgeson's attorneys opined that, if they had been aware of the agreements, they would have used the agreements to attack the credibility of Dawley and Symonds. Ham said that it "would have been [an] extremely powerful weapon[] in attacking [their] credibility." R2-10, Ex. Vol. 20, Ex. 52 at 3664.

13

decision to . . . try Dawley and Symonds in juvenile court had already been made. A discussion was had with Mr. Brown concerning Mr. Dawley because [the investigator] wanted to talk to him some more. And I suppose the deal aspect of that came in with, if he cooperates, then I will let the Court know at the appropriate time that he cooperated; on the contrary, if he doesn't, I'll let the Court know that, as well.

Id. at 245-46. When asked about his deposition testimony that he agreed to leave Dawley and Symonds in juvenile court but chose not to negotiate a delinquency finding for the sake of "credibility," Floyd explained that "there really was no deal in the sense of a plea bargain" and hoped that a jury "would not think their testimony was influenced in any way." Id. at 252-55. He clarified that it was not a "deal" "in the strict sense of that term" but that he "told them that, if they would testify and cooperate, that . . . their cases would be tried in juvenile court." Id. at 257. He conceded that the agreement to try Dawley and Symonds in juvenile court in exchange for their testimony "was not public record, but it was known to counsel for both Mr. Carr and Mrs. Burgeson because I told them." Id. at 256. He did not know the date of his disclosure to their counsel, but commented that he "talked to them on many occasions." Id. at 258.

Carr's claim was denied by the state habeas court and the state appeals court. The state appellate court denied the Brady/Giglio/Napue claim, finding insufficient evidence "of the existence of deals between the State and Symonds

14

and Dawley." R2-10, Ex. Vol. 27, Ex. 63 at 44. The Georgia Supreme Court affirmed.[7] Carr II, 544 S.E.2d at 412-13.

4. Applicable Law

Due process is violated when the prosecution suppresses evidence that is favorable to the defense and material to the defendant's guilt or punishment, Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97, or knowingly uses false evidence or "allows it to go uncorrected," Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959), even where the evidence "goes only to the credibility of the witness" because the jury's estimation of that witness's reliability may be determinative of the defendant's guilt. Id. at 269, 79 S. Ct. at 1177. Reversal is not required, however, where the evidence, although useful to the defense, was not likely to have changed the verdict. Giglio, 405 U.S. at 154, 92 S. Ct. at 766.

A conviction obtained by the knowing use of false or perjured testimony, including testimony that reflects on the credibility of the witness, will "be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," or where the prosecutor's failure to respond to a discovery request misled the defense and created "a reasonable probability that,

---

[7] The court stated that "[t]he evidence supports the habeas court's findings that there were no deals between the district attorney and the juvenile witnesses in exchange for their testimony and that there was no . . . prosecutorial misconduct during Carr's trial." Carr II, 544 S.E.2d at 412-13.

had the evidence been disclosed to the defense, the result of the proceedings would have been different." United States v. Bagley, 473 U.S. 667, 678-679, 682, 105 S. Ct. 3375, 3382-83 (1985).  Perjured testimony "is considered material unless failure to disclose it would by harmless beyond a reasonable doubt." Id. at 680, 105 S. Ct. at 3382.  The more specific the request, "the more reasonable it is for the defense to assume from the nondisclosure that [the impeaching information] does not exist, and to make pretrial and trial decisions on the basis of this assumption." Id., 473 U.S. at 682-83, 105 S. Ct. at 3384.  Constitutional error exists where the prosecution failure to disclose evidence, including evidence that would have impeached the eyewitnesses' testimony, and the defendant failed to receive "a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566 (1995).  Defense counsel is entitled "to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination." Strickler v. Greene, 527 U.S. 263, 284, 119 S. Ct. 1936, 1949 (1999).  Evidence that a witness has lied under oath is "direct proof" that the witness might alter the truth for his own benefit, United States v. Bernal-Obeso, 989 F.2d 331, 336 (9th Cir. 1993), and can provide "the assault that was

16

warranted" on the witness's testimony instead of limiting the defense to inconsistencies in testimony as grounds for impeachment. Kyles, 514 U.S. at 443 n.14, 115 S. Ct. at 1570 n.14. "[W]here the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony," the testimony is considered material "'if there is any reasonable likelihood that the false testimony *could have* affected the judgment of the jury'" United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995) (alteration in original) (quoting United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976)). Evidence of a defendant's state of mind, and specifically whether his actions at the time of the murder were impulsive or premeditated, is an important consideration for a jury on whether to recommend the death penalty. Dobbs v. Turpin, 142 F.3d 1383, 1389 (11th Cir. 1998).

5. Application of Relevant Law to These Facts

The juveniles' testimony was a keystone in the case against Carr. It was critical to Carr's state of mind at time of the offense, and to the degree of aggravation of the crime. They both testified that Young pleaded for his life. Dawley said that Carr told Young that Carr was "going to kill you, boy" and directed Dawley to get the baseball bat from the car. R2-10, Ex. Vol. 5, Ex. 11 at 1457-58. Symonds testified that Carr whispered to her in the car on the way to the

17

crime scene that he "was going to kill [Young]." Id. at 1380-81. Floyd urged the jury to credit Dawley and Symonds' testimony over Carr's testimony during his arguments at the end of both the penalty and sentencing phases.

A majority of the witnesses, however, testified that no deal had been offered to Dawley and Symonds. Dawley, his attorney, and Symonds stated a number of times that they had not been offered any deal in exchange for their testimony. The district attorney testified at the state habeas hearing that he never negotiated an agreement with Dawley and Symonds. Dawley and Symonds were sentenced two years before Carr's trial. Therefore, any "deal" by Floyd with Dawley and Symonds to leave their proceedings in the juvenile court in exchange for their testimony was limited to the testimony that they provided the investigators and would have expired by the time of Carr's trial. Moreover, if a deal existed, Carr's counsel was aware that Dawley and Symonds were tried in juvenile court, that there was no significant change in their testimony as to Carr's actions or motivation, and that their testimony would not have changed the outcome of Carr's conviction or sentence in light of the overwhelming evidence. Thus, the district court did not err in finding that the state courts did not unreasonably determine the facts in light of the evidence presented and properly applied the law to those facts.

18

C. The alleged *Caldwell* violation

Carr contends that the state undermined the jury's sense of responsibility for sentencing by arguing that the jury would merely be making a recommendation for sentencing which would then be imposed by the trial judge. He maintains that his sentencing was rendered fundamentally unfair because no corrective action was taken by counsel or the trial judge.

1. Statements Made During Sentencing

During the sentencing phase, the prosecutor began his closing argument by explaining the jury's duties during sentencing. He explained that the decision to seek the death penalty is made by the district attorney, and that he had made that decision in this case. He elaborated that "a jury should ultimately decide whether or not . . . Carr would serve life in prison or be electrocuted in the Georgia electric chair, [and] not [the prosecutor], not a judge, but a jury." R2-10, Ex. Vol. 6, Ex. 13 at 1900-01. He explained,

> Now, Ladies and Gentlemen, as I say, you're going to make the recommendation as to punishment. Now, don't misunderstand. You're not going to sentence this Defendant. The Judge is going to sentence him, and you should not feel that you are doing anything to Timothy Don Carr. It's your job to listen to the evidence, to evaluate the evidence, and to decide the appropriate punishment, and then you make a recommendation as a jury.
> . . . [I]t takes a[n] unanimous verdict before the death penalty can be imposed. If one of you doesn't vote for the death penalty, it's not a mistrial. We don't do this again. It's a life sentence.

19

. . . We bring [the punishment] back to the people and let them decide these difficult questions [as to whether to impose a death sentence]. You've got to decide this question, not [the prosecutor], not [the defense attorney], not [the trial judge], but you twelve ladies and gentlemen. You need to know what the consequences of your acts are. If you can't become unanimous, then it's a life sentence.

R2-10, Ex. Vol. 6, Ex. 13 at 1904-05. He later continued, "You've got two choices, life in prison, or recommend to [t]he Court to sentence him to death." Id. at 1919. Carr's attorney asked the jury to "say by your verdict: We believe in fairness. We believe in the sacredness of a human life, and thou shalt not kill" instead of "vot[ing] to tell the Judge . . . that it's all right to kill that twenty-three-year-old man child." Id. at 1933, 1925.

The judge began the charge by explaining to the jury that the determination of the punishment was "our" duty. Id. at 1935. He instructed the jury that, if they found Carr guilty of "one or more statutory aggravating circumstances," they were "authorized to authorize the imposition of a sentence of death." Id. at 1941. He advised that their verdict would thus read: "We, the jury, find the following statutory aggravating circumstance or circumstances, and . . . fix the penalty at life imprisonment, or we recommend the death penalty," id. at 1941, and continued that if their verdict was "the death penalty . . . then the Defendant would be sentenced to be put to death in the manner provided by law." Id. at 1942. He advised them to disregard "any hint, suggestion, or opinion by [t]he Court as to

20

what penalty should be imposed in this case," and that "[w]hatever penalty is to be imposed within the limits of the law as I have instructed you is a matter solely for you the jury to determine." Id. at 1942.

2. Consideration on Appeal

On direct appeal, the Georgia Supreme Court held that it had "considered [the prosecutor's remarks] in the context of the entire sentencing proceeding" and held that:

> "(t)o establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law. [Cit.]" Romano v. Oklahoma, [], 512 U.S. [1,] 9, 114 S. Ct. [2004,] 2010 [(1994)]. Viewed in context, the prosecutor's comments in this case do not contravene Caldwell, since the prosecutor's description of the jury's role was not an affirmative misstatement of the law and any confusion this isolated portion of argument may have engendered was alleviated by the repeated emphasis of the entire proceeding that the jury, and not the prosecutor or the court, was vested with the decision as to whether Carr should live or die.
> . . .
> The jury's role as sole decision maker was reinforced throughout the entire sentencing phase proceeding.
> . . .
> Any lingering confusion as to the jury's role would have been alleviated by Carr's closing argument and the trial court's charge. Carr made it clear that the jurors were the sole decision maker. The entire thrust of his argument was to impress on the jury its awesome responsibility in deciding punishment . . . .

Carr I, 480 S.E. 2d at 593-94.

21

The district court found "no decision contrary to or involving an unreasonable application of clearly established federal law as determined by the Supreme Court" and that "the state court decisions were not based on an unreasonable determination of the facts in light of the evidence presented." R2-17 at 9. It concluded that Carr had "pointed to no case and the Court has found no factually indistinguishable case from the United States Supreme Court that was applied incorrectly by the state courts in this case." Id. at 13-14. In its denial of a COA, the district court found that, following an "exacting review" of the state court's factual findings, the findings "were presumed to be correct and [Carr] failed to prove otherwise by clear and convincing evidence." R2-23 at 2. The district court further found that the state court neither applied a rule of law that contradicted Supreme Court precedent or that resulted in a different opinion than that reached by the Supreme Court in materially indistinguishable facts nor based its decision on an unreasonable determination of the facts, established by the presented evidence. R2-23 at 2.

3. Law Applicable to Our Review

We review the closing arguments for impropriety under careful scrutiny, and will reverse only if the argument rendered the proceeding "'fundamentally unfair.'" Cargill v. Turpin, 120 F.3d 1366, 1379 (11th Cir. 1997) (citation

22

omitted).  "[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S. Ct. 2633, 2639 (1985).  "To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law."  Dugger v. Adams, 489 U.S. 401, 407, 109 S. Ct. 1211, 1215 (1989).  However, a Caldwell violation is not established where "the jury was not affirmatively misled regarding its role in the sentencing process."  Romano v. Oklahoma, 512 U.S. 1, 9, 114 S. Ct. 2004, 2010 (1994).  We have, therefore, held that "references to and descriptions of the jury's sentencing verdict . . . as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority" do not constitute Caldwell violations where they "accurately characterize the jury's and judge's sentencing roles under [state] law."  Davis v. Singletary, 119 F.3d 1471, 1482 (11th Cir. 1997).

In Georgia,

[i]n all cases tried by a jury in which the death penalty . . . may be imposed, . . . the jury shall retire to determine whether any mitigating or aggravating circumstances . . . exist and whether to recommend mercy for the defendant.  Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law.

23

O.C.G.A. § 17-10-2(c) (2002). Once the jury has made its determination, the judge's role is mandated. "Where a statutory aggravating circumstance is found and a recommendation of death is made, the court shall sentence the defendant to death." O.C.G.A. § 17-10-31 (2002).

4. Application of Law to These Facts

The jury was informed that the trial court was required to impose a death sentence on their recommendation by both the district court's jury instructions and the prosecutor's argument as a whole. The prosecutor's comment accurately characterized the jury's role as recommending the sentence to the judge, and the parties arguments and judge's instructions informed the jury that they were the arbiters of the sentence imposed on Carr.

D. Ineffective Assistance of Counsel

Carr contends that his trial counsel were ineffective for failing to adequately develop and present mitigating evidence at sentencing. He maintains that this evidence would have corroborated his testimony regarding his relationship with Burgeson, her dominating and manipulative personality, and her role in the crime. He argues that counsel failed to present documentary and testimonial evidence of his upbringing, corroborating his serious mental health problems, and evidence of his good character. He asserts that the Georgia Supreme Court focused on the

24

quantity, instead of the quality, of evidence presented during sentencing, and failed to consider the quality of the unobtained mitigating evidence. He maintains that the Georgia Supreme Court's decision is contrary to United States Supreme Court precedent and based upon an unreasonable determination of the facts.

1. Testimony Presented During Carr's Trial

During opening and closing arguments in the guilt phase of the trial, the prosecutor attacked Carr's trial testimony as concocted lies, and argued that Carr's testimony regarding his relationship with Burgeson and his childhood was uncorroborated by any credible independent testimony. He also commented that one of the mental health expert's testimony as to the development of Carr's state of mind on the night of the murder was "hearsay," R2-10, Ex. Vol. 6, Ex. 13 at 1912-13, because everything the psychiatrists and psychologist knew about Carr was told to them by Carr or his family. Id. at 1916.

At sentencing, Carr presented the testimony of (1) psychologist Dr. Robert Storms; (2) registered psychiatric nurse and clinical social worker, Darrian Jones Bogenholm; and (3) addiction psychiatrist, Dr. James Spencer Cheatham as mental health experts, and (4) Carr's mother, Georgia Carr; and (5) uncle, William A. Smith as character witnesses.

Storms testified that Carr had a life-long history of depression, alcohol and drug abuse, and was not only "very psychologically dependent" on Burgeson but was also "basically a very dependent guy." R2-10, Ex. Vol. 6, Ex. 13 at 1772. He said that Carr and his family were superstitious and believed in "witchcraft and paganism." Id. at 1774-77. He explained that Carr relied heavily on Burgeson in the area of the occult, and that Burgeson was a "psychologically dominant individual" and "classic enabler." Id. at 1777-78. He saw nothing that would lead to the conclusion that Carr "had an excessively violent temperament." Id. at 1780.

Carr introduced Bogenholm "as an expert in the field of psychological evaluation." Id. at 1812, 1815. The prosecutor objected that he did not believe Bogenholm was "qualified as an expert in the field of forensic psychology in order to offer an expert opinion in that area" and that her testimony, which she acknowledged was based on interviews with Carr and his family members, was "hearsay." Id. at 1816, 1818, 1820. The trial judge overruled the prosecutor's objection since interviewing is "the main way of gathering information" "in the psychological and psychiatric area." Id. at 1821.

Bogenholm then explained that some of the problems Carr experienced could be attributed to the problems that his mother had during her pregnancy with him and during his birth. She stated that Carr's father was an alcoholic who

26

physically and emotionally abused his mother and Carr, and that Carr saw his father beat his mother frequently and tried to protect her when he was as young as three years old. Bogenholm explained that Carr had been sexually abused by both male and female "family members, [and] various members of the community . . . from the time of the age of three." Id. at 1826. She substantiated Carr's stories of abuse by interviewing one of the male abusers. She described Carr, who had attempted suicide several times as a child by beating his head against a floor or wall, and later through drug abuse, as suffering from depression. Bogenholm noted that she had found Carr to be "very sensitive" and "very compassionate." Id. at 1848.

Cheatham testified that Carr had a "very lengthy history of drug and alcohol abuse" or "multi-substance abuse" and, though "[n]ot by nature" a violent person, had a "heightened potential for violence" when he was "under the influence of drugs or alcohol." Id. at 1859-60. He explained that Carr was "very strongly influenced by satanism and witchcraft" and was easily controlled by Burgeson, who he identified as a witch. Id. at 1862. He also opined that Carr became emotionally dependent on Burgeson and was afraid that Burgeson would harm him. Cheatham reviewed the testing that had been performed on Carr, and advised that there was "some very strong indication of . . . early life brain injury." Id. at

27

1877-78. He also noted that Carr suffered from severe depression, and that there were many factors involved in Carr's behavior. Id. at 1879-80. He believed that Carr could be helped by treatment. Id. at 1880.

Georgia Carr, Carr's mother, testified that Carr was "a happy child" who loved his father, Ulla Donnell Carr, although Ulla denied that Carr was his son and was cruel to him. Id. at 1793-95, 1799. She explained that she and Ulla divorced when Carr was ten, and Carr lived with her until he was fourteen and then moved in with his father. She had never seen Carr act violently. Carr's uncle, William A. Smith, also testified that Ulla rejected that Carr was his child.

Duing the penalty phase closing arguments, the prosecutor questioned whether "there [was] any redeeming social value in Mr. Carr" and discussed Carr's criminal record before emphasizing the deterrent effect of the death penalty. He discredited Carr's defense and the testimony of the witnesses to Carr's childhood and its effect on him. Carr's attorney responded by arguing that, if the jury voted for the death penalty, they would never know whether Carr had "any redeeming grace and redeeming characteristics." Id. at 1928.

2. Testimony Presented During Carr's Habeas Proceedings

At the state habeas corpus proceedings, Martin testified that, when preparing for trial, he developed a strategy for the mitigation phase and conducted

28

an investigation for mitigating evidence. R2-10, Ex. Vol. 10, Ex. 42 at 330, 333, 343. He acknowledged that he had asked the state's psychologist, Dr. Storms, about testifying about Carr's "future dangerousness" but that Storms "had no comment on that."[8] Id. at 356-57. Martin requested and was granted a court-appointed psychiatrist, Dr. Cheatham, and said that both an MRI and a CT scan were performed on Carr. He said that he also reviewed Carr's school and medical records, and then sent these records and the names of all known relevant individuals to Dr. Cheatham and his colleagues, Bogenholm and Franco, for review.

During interviews with Carr, Martin learned that Carr had been subjected to his family's alcohol and sexual abuse, and that there were family members who suffered from mental illness.[9] He said that he elected not to call some of the individuals listed by Carr as potential witnesses because he did not believe they could help Carr and could actually have had a negative impact on the jury.[10] Id. at

---

[8] Martin said that, although Carr saw Dr. Ellis, a psychologist who worked with the Lamar County Prison, on a weekly basis, he did not call Ellis to testify in mitigation "[b]ecause I did not feel that he had the medical expertise, nor the training, nor background to . . . help Mr. Carr. I felt that the people who I had amassed and was going to use were going to be sufficient to do what I was appointed to do." R2-10, Ex. Vol. 10, Ex. 42 at 382.

[9] Martin clarified that these individuals were not institutionalized in mental health facilities, but were in prison and that he had no such information on other members of Carr's family.

[10] Specifically, Martin did not call Richard Carr, Carr's cousin, who was imprisoned for murder, id. at 335, and Scott Hubbard, a long-time friend, who had told Martin that he spent "six

335, 371. He stated that he did not "go into character evidence" because the prosecution had Carr's record available, and he "didn't have any characters to put in." Id. at 477. Martin explained that he had requested and received a narrative and letters from Carr's mother and family members, and had used it in preparation for trial.[11] He said that he did not call some of the letter-writing individuals because they had "some problem in answering [Martin's] questions" or had made inconsistent statements to Martin. Id. at 339-40, 486.

Martin said he met with Carr's family "on a regular basis" and had talked to "anyone that had something [to] contribute[] to Mr. Carr's defense." Id. at 340-41. He also talked to potential witnesses about Burgeson's manipulative nature, but the "people that [he] talked to were not . . . consistent in their . . . statements." Id. at 388-89. He explained that he was unable to tell whether some of the individuals were telling the truth because their stories changed from day to day, and "did not feel they had any probative value in [Carr's] case." Id. at 372, 380. Martin said

_____

months drunk" and used a lot of pot, crack, and hallucinogenic mushrooms, id. at 337-38. He indicated that he would not have called Richard Carr as a witness "on Mr. Carr's life and my life," id. at 335, and that Hubbard was "[n]ot at all what I wanted on behalf of Mr. Carr." Id. at 338.

[11] Georgia Carr, Carr's mother, provided Martin with an affidavit detailing Carr's childhood, including an episode in which Carr saved his dad from choking. She also provided signed testimonials from 21 character witnesses on Carr's behalf.

that, in deciding whom to call as mitigation witnesses, he looked at whether "they

could help" Carr. Id. at 380.

During the state habeas proceedings, Carr submitted testimony regarding

Burgeson's history of violent, dominating behavior,[12] Carr's intoxication and

---

[12] Scott Hubbard stated that, although he had been in a relationship with Burgeson for about five years, it was a "terrible experience" for all but about six months. R2-10, Ex. Vol. 17, Ex. 49 at 2832. He explained that she was "very controlling" and "intimidating" and often threatened people. Id. He stated that she was into pills, marijuana, acid, hallucinogenic mushrooms, and liquor, and supplied him with drugs to keep him "in line." Id. at 2832-33. Hubbard said that Burgeson was "very disturbed," "used to getting whatever it was she wanted," "had no conscience," and "was into witchcraft." Id. at 2832. He claimed that their "relationship involved a lot of . . . physical fighting," that he spent much time defending himself from her beatings, and that, on one occasion, she threw a knife at him. Id.

> Young's cousin, Richard Hambrick, testified that Burgeson
> thought she could exercise power over people. . . . [Burgeson] took [witchcraft] very
> seriously, and several of the people that hung around with her took it pretty serious,
> too. They were afraid of her; people knew not to fuck with her.
> 3. [Burgeson] seemed to have a lot of power over several people in the group. . . .
> [Burgeson] was an extremely violent person and a big bully. She was not afraid to
> get up in your face no matter who you were. . . . [P]eople were afraid she would carry
> out her threats. [Burgeson] carried a seven inch hunting knife around with her. . . .
> She always had it on her.
> . . .
> 4. . . . [Burgeson] knew exactly what she was doing and her ability to manipulate
> people was scary. . . . One night . . . [Burgeson] got several people there to jump on
> this one guy passed out in the . . . chair. They started throwing food on him and then
> dumping cigarettes and cigarette ashes on him. He got up and went outside. Folks
> from the party followed him out and poured kerosene on his boots and set them on
> fire. He jumped up and put the fire out. The next thing I knew, they had thrown him
> into a fire pit. . . . Fortunately, for him there was no fire in the pit . . . .
> 5. The other incident . . about [Burgeson's] extreme violence was when she had
> several people in her group jump on a guy . . . at a party . . .[Burgeson] had []
> Symonds invite [the victim] to the party. . . . Someone hit [the victim] in the face
> with a guitar. Several people just jumped on the guy and beat the shit out of him.
> He was lynched around the throat and drug around the room. He was then taken out
> and put in the trunk of the car and beat again. They drove him around in the trunk
> of the car for a while and then dumped him out by the railroad tracks. . . .

31

behavior on the days leading up to the crime,[13] Burgeson's abusive behavior

6. The crowd was very much into partying. . . . [Burgeson] was also a drug dealer. . . . [Burgeson] never gave anything away. If she gave you drugs it was for a reason. . . . so they would owe her. . . . [Burgeson] used the drugs and other things to control people.

7. . . . People at those parties would go crazy and do anything she told them to do.

Id. at 2844-47. Angel Beaver, a friend of Symonds, also testified regarding the beating after Symonds had invited the victim to the party at Burgeson's request. Symonds's sister, Marni Robinson, stated that Burgeson was manipulative and had other people "do her dirty work." Id. at 2843. Beaver commented that Burgeson "had an unnatural ability to manipulate people" and "could be very threatening." Id. at 2838. Beaver observed that the people around Burgeson "were intimidated by her. . . . She would get everyone drunk and exercise her control over them." Id. at 2838-39. She said that Burgeson "would make" Symonds sell "crystals" for drug money, and that Symonds was so scared of Burgeson that she would pay her although she had not sold any crystals. Id. at 2839.

[13] Hubbard said that, after Carr moved in with Hubbard and Burgeson in 1991, Carr was "always eating the mushrooms, smoking dope, doing acid, and drinking." Id. at 2833. He explained that Carr was at a low point in his life, "didn't feel that there was any kind of a future ahead" of him, and was "becoming addicted to the drugs and alcohol" supplied by Burgeson. Id. Hubbard said that he and Carr "worked" for Burgeson by burglarizing houses and then giving Burgeson the stolen goods so that she could then pay for rent, drugs and alcohol for all of them. Id. Hubbard and Tammy Leone both stated that, after Carr found out that Hubbard and Leone were "involved," he became angry and got "sexually involved" with Burgeson. Id. at 2822, 2834. Hubbard and Leone said that, in early October 1992, Carr spent a lot of time with Burgeson while Leone was at work, and was using a lot of drugs and alcohol while he was with Burgeson.

Hubbard and Leone said that, on the night of the murder, Carr appeared "stoned" before he began drinking. Id. at 2824, 2835. Hubbard claimed that Carr continued drinking and "was so drunk he wasn't making sense." Id. at 2835. Leone declared that Carr drank "almost all of the [fifth of] Tequila and smoked a ton of pot. He got so drunk and drugged-out. He acted wired and irrational." Id. at 2824. Carr's aunt, Claudia Smith, and cousins, Brenda Barnes, Debbie Harris, and Rhonda Simmons, saw Carr and Burgeson a day or so before the murder. Smith reported that Carr and Burgeson "seemed like they were out of their heads." Id. at 2753. Barnes said that the two were "clearly drunk and high to the point that they were out of their heads." Id. at 2777. Harris remembered that Carr was "dazed and a little scared, and he couldn't seem to respond to [Burgeson]." Id. at 2782. Simmons reported that Carr was holding a liquor bottle and "looked like he was in a daze or sick . . . just sort of staring ahead" and not saying much. Id. at 2785. Barnes said that, after Burgeson tried to choke Carr, Carr "looked scared and tried to get her off him, but he was too drunk." Id. at 2777. Smith said that Carr "was acting like a crazy man that night. . . . hopping around and pawing at the dirt like an animal." Id. at 2754. She said that Carr went into the woods with Burgeson, and when he came out, he was "looking around . . .like he just woke up or something. He kept asking what was going on and where was everybody." Id.

toward Carr during that same period of time,[14] and his relationships with his

family and in the community.[15] Symonds' sister, Marni Robinson; Symonds'

[14] Hubbard and Leone stated that, after Carr and Leone attempted to reconcile in September of 1994, Burgeson became "fiercely angry" and began acting bizarrely, wearing all black, carrying a knife, and dying her hair to match Leone's. Id. at 2822-23, 2835. Leone said that Burgeson "scream[ed] bloody murder" when Carr told her that he had chosen to stay with Leone, and that Carr acted scared of Burgeson. Id. at 2823. Hubbard said that, on the night of the murder, Burgeson appeared "drunk or high on something," was hostile to Leone as if "she wanted to pick a fight with her." Id. at 2835. Leone said that, after she refused Burgeson's order for her to have a drink of tequila, Burgeson told her that she would

> force it down [her] throat . . .
> 33. [Burgeson] then asked [Leone] to step outside. [Burgeson] told [Leone] [that they] could share [Carr] and [Hubbard]. [Leone] told her no way, that she could have [Carr] to herself. When [Leone] said that, [Burgeson] got super angry . . . and started looking for her knife in her pocketbook saying "Where's my knife?" She was going crazy looking for it, and [Leone] got real scared because [she] thought [Burgeson] had lost her mind and was going to come after [Leone]. [Burgeson] started shouting at [Carr], who seemed completely drunk and out of it. Then she hauled off and slapped him hard across the face. [Carr] didn't do anything but sort of crouch there trying to avoid another hit. They were acting crazy.
> 34. [Burgeson] couldn't find her knife, and she went back to drinking.

Id. at 2824. Barnes and Simmons stated that Burgeson was "acting like a crazy woman," and Simmons said that Burgeson was "screaming and cussing read bad . . . about how she couldn't find her knife." Id. at 2777, 2786. Hubbard and Simmons both asserted that Burgeson began shouting at all of them, angry that she could not find her knife, and slapped Carr when he did not know where it was. Simmons reported that Burgeson slapped Carr

> so hard that it spun [Carr] around sideways. He staggered for a second and sort of cowered a little while [Burgeson] stood over him. He held his hand to his face and looked at [Burgeson] with a shocked and scared look on him. . . . [Carr] didn't do or say anything back to [Burgeson].

Id. at 2786. Barnes remembered that Burgeson had "rushed up to [Carr] and put her huge hands on his neck and started to choke him" and "heard her threaten to kill [Carr]." Id. at 2777. Harris stated that Burgeson was "acting crazy, wild," "had killing in her eyes," shoved Carr, and told Carr that she would "kill [his] ass right here!" Id. at 2782. Leone said that she left to call for a ride, and returned to find Carr "looking like he hardly knew where he was or what was going on" and Burgeson looking insane and saying that she "wanted [Leone's] blood." Id. at 2825.

[15] Frankie Hollis, a neighbor of Carr's father, had known Carr for 18 years. She stated that Carr babysat for her children, and that she found him to be trustworthy and loving around children.

Brenda Barnes, Carr's cousin, attended Carr's trial and could have also testified as to the event in which Carr "saved his daddy's life." Id. at 2771. When his father started choking on a piece

33

friend, Angela Beaver; Young's cousin, Richard Hambrick; Scott Hubbard; Carr's

ex-wife, Tammy D. Leone; Carr's cousins, Brenda Barnes, Debbie Harris, and

Rhonda Simmons; and Carr's former neighbor, Frankie Hollis, stated that they

were not contacted by Carr's trial attorneys but would have testified for Carr.

Carr's aunt, Claudia Smith, also said that she never talked to Carr's trial attorneys,

but was subpoenaed for the trial. Nonetheless, she attended the trial, but was

never called to testify. Carr's attorney's billing records and trial record showed no

evidence of any contact with any of the potential witnesses who had written

testimonials on his behalf.

3. Treatment of Claim During Habeas Proceedings

The state habeas court found Carr's trial counsel's performance deficient as

to the presentation of mitigating evidence. It noted that

> [Carr's] mother, Georgia Carr, was readily available to aid her
> son's defense; however, counsel failed to elicit a fraction of the
> mitigating information Mrs. Carr was prepared to present . . .
> For the purposes of the habeas hearing, Mrs. Carr testified that
> [Carr's attorney] failed to prepare her prior to her testimony at the
> sentencing phase of the trial and did not allow her to ask the jury for
> mercy for her son. According to Mrs. Carr, [Carr's attorney] did not
> touch on most of the information in her narrative.
> . . .
> [C]ounsel failed to present evidence concerning [Carr's] reaction to
> the death of his father, which might have served to explain his drug

of meat, Carr performed the Heimlich maneuver on his father.

34

and alcohol abuse and his relationship with Burgeson. It might also have better explained the events leading to Young's death.

[Carr] has also presented affidavits of numerous witnesses who would have described his depression and mental state in the days preceding Young's death and who would have testified about Burgeson's abusive behavior toward [Carr]. Had these witnesses been contacted by [counsel] and given an opportunity to testify, the result of the sentencing phase likely would have been different.

. . .

The defense strategy at trial was to demonstrate that Burgeson intimidated [Carr] into following her command to attack Young; however, counsel only presented [Carr's] testimony to support this theory, despite the availability of supporting witnesses. . . . Counsel's failure to contact these potential witnesses or to use their testimony to corroborate [Carr's] testimony is unreasonable and likely was prejudicial such that the outcome of the sentencing could have been different.

R2-10, Ex. Vol. 27, Ex. 63 at 33-35. The state habeas court also noted that Georgia Carr's affidavit and counsel's billing statements directly contradicted Carr's attorney's testimony that "he had interviewed everyone who had presented a [testimonial] letter" in support of Carr. Id. at 39. It found "a reasonable probability that the outcome of the sentencing phase would have been different had the jury heard testimony about [Carr's] good character." Id. at 40.

The Georgia Supreme Court held that state "habeas court's findings [we]re either clearly erroneous factually or legally insufficient." Carr II, 544 S.E.2d at 419. The court noted that, prior to trial, Carr's attorneys received reports from a psychiatrist, two psychologists, and a social worker experienced as a mitigation

35

investigator, and interviewed several of Carr's family members and solicited letters from other family members and acquaintances for mitigation evidence. Id. at 414-15. Specifically, the Georgia Supreme Court found that the record showed that Carr's trial counsel contacted "several of the[] potential witnesses" "'who would have described [Carr's] . . . mental state in the days preceding Young's death and who would have testified about Burgeson's abusive behavior toward [Carr],'" and that Carr's trial counsel's testimony about his reluctance to call various Carr family members and friends indicated "valid strategic reason[s] for limiting the use of these witnesses." Id. at 421. It also found that there was "no actual prejudice because Carr and his experts [and other witnesses] testified about Carr's . . . mental state . . . as well as Burgeson's dominating personality and behavior." Id. Moreover, the court found that Carr's counsel was not deficient with regard to the presentation of good character evidence since he "presented Carr's mother and uncle to testify about Carr's good, non-violent character" and believed a large number of character witnesses "would not have been effective in light of Carr's criminal record and the evidence presented at trial." Id. at 424.

The federal district court denied relief on this claim, finding that Carr failed to show that the decision by the Georgia Supreme Court had unreasonably applied the applicable law or unreasonably applied the facts in light of the evidence

36

presented. The court specifically noted that there was "no reasonable probability that, absent the alleged errors, the state courts would have concluded the balance of aggravating and mitigating circumstances did not warrant death in this case." R2-17 at 13.

    4. Law Applicable to Our Review

We review the mixed questions of law and fact raised in an ineffective assistance of counsel claim de novo, and review the district court's findings of fact for clear error. Mincey v. Head, 206 F.3d 1106, 1142 (11th Cir. 2000). We, therefore, review the district court's factual determination as to whether counsel's decisions were tactical or strategic for clear error, but review the legal question as to whether that tactic or strategy was reasonable under the circumstances de novo. Horton v. Zant, 941 F.2d 1449,1462 (11th Cir. 1991). The determination of credibility, including an attorney's testimony regarding decisions of tactic and strategy, is within the province of the district court, which has the opportunity to observe and study the witness. Cave v. Singletary, 971 F.2d 1513, 1518 (11th Cir. 1992). To establish a claim of ineffective assistance of counsel, "a petitioner must show both that his counsel's performance was deficient and that he was prejudiced by his counsel's errors." Zeigler v. Crosby, 345 F.3d 1300, 1308 (11th Cir. 2003).

37

In capital cases, the sentencer is required to consider all relevant aspects of the defendant's character, the record, and the circumstances of the offense to provide the necessary "respect due the uniqueness of the individual," Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 2964-65 (1978), for the "highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves." Turner v. Murray, 476 U.S. 28, 33-34, 106 S. Ct. 1683, 1687 (1986) (internal citation and quotation marks omitted) (plurality opinion). It is essential that the sentencing body consider the "compassionate or mitigating factors stemming from the diverse frailties of humankind." Woodson v. North Carolina, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991 (1976). Ineffective assistance of counsel is established when counsel has failed to provide the jury with the "totality of the available mitigation evidence . . . [to] []weigh[] . . . against the evidence in aggravation," including a "graphic description of [the defendant's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' [which] might well . . . influence[] the jury's appraisal of his moral culpability." Williams v. Taylor, 529 U.S. at 397-98, 120 S. Ct. at 1515. "Mitigating evidence, when available, is appropriate in every case where the defendant is placed in jeopardy of receiving the death penalty." Horton, 941 F.2d at 1462. An attorney who mistakenly believes that mitigating evidence is not

38

appropriate and who, therefore, fails to investigate has "fallen below [a] reasonable professional norm[.]" Id.

A defense counsel's elicitation of evidence that a defendant facing the death penalty "had a 'good' reputation, . . . was generally known as a hard worker who took care of his family, and . . . had a good reputation for truth and veracity" is not enough to meet the "standard of objective reasonableness required by the Sixth Amendment." Collier v. Turpin, 177 F.3d 1184, 1201-02 (11th Cir. 1999). Counsel must present "more than a hollow shell of the testimony necessary" for the jury's "'particularized consideration of relevant aspects of the [defendant's] character and record.'" Id. (quoting Woodson, 428 U.S. at 303, 96 S. Ct. at 2991). Counsel's failure to demonstrate available evidence of the defendant's upbringing, disposition, history of providing needed assistance to his family and others, acts of compassion and heroism, and circumstances at the time of the crime, especially his health, employment history, and economic status, "br[ings] into question the reliability of the jury's determination that death was the appropriate sentence." Id. at 1202. Counsel's failure to introduce evidence of a defendant's good character, because of the possibility that the prosecution could introduce unfavorable prior unlawful acts, has been found ineffective where the good character testimony "constituted the only means of showing that [the defendant] was perhaps less

39

reprehensible than the facts of the murder indicated," <u>Harris</u>, 874 F.2d at 764, or demonstrated that the defendant did well in a structured environment. <u>Williams</u>, 529 U.S. at 396, 120 S. Ct. at 1514. Moreover, ineffective assistance of counsel is demonstrated where counsel "fail[ed] to present any witnesses at the sentencing hearing" and thus permitted the prosecutor to emphasize the defendant's "lack of redeeming character" by arguing that the jury was unable to learn anything about defendant's character from anyone whom the defendant knew. <u>Cave</u>, 971 F.2d at 1519.

5. Application of Law to These Facts

Although defense counsel failed to call all possible witnesses for testimony regarding Carr's "good" character, the witnesses who did testify provided positive character information as well as information regarding the physical, emotional, and sexual abuse that he had suffered during childhood, the possibility of organic brain damage, and his mental state at the time of the crime. The evidence that was presented provided the jury with the information necessary to ensure the determination that death was the appropriate sentence.

### III. CONCLUSION

We find no reversible error in the district court's opinion and judgment. Therefore, the denial of Carr's petition for writ of habeas corpus is **AFFIRMED**.

EDMONDSON, Chief Judge, concurs in the result.