[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-12502

_____

D. C. Docket No. 01-02136-CV-T-27TGW

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 14, 2006
THOMAS K. KAHN
CLERK

DOMINICK OCCHICONE,

Petitioner-Appellant,

versus

JAMES CROSBY, SECRETARY,
Florida Department of Corrections,
CHARLIE CRIST,
Attorney General of the State of Florida

Respondents-Appellees.

_____

Appeal from the United States District Court for the
Middle District of Florida

_____

**(July 14, 2006)**

Before ANDERSON, DUBINA and CARNES, Circuit Judges.

ANDERSON, Circuit Judge:

Dominick Occhicone appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254, claiming that the Florida Supreme Court failed to recognize that his right to a fair trial was abridged by the prosecution's failure to correct testimony known to be perjured. We find no such error and affirm the district court's denial of the petition.

## I. BACKGROUND

On July 11, 1986, Dominick Occhicone killed Martha and Raymond Artzner, the parents of his ex-girlfriend, Anita Gerrety. For each death, he was convicted of murder in the first degree. On October 27, 1987 he was sentenced to death for one conviction and life imprisonment for the other.

After exhausting both his direct appeals and his state collateral appeals, Occhicone filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254 in the United States District Court for the Middle District of Florida on November 13, 2001. The court denied Occhicone's petition on March 31, 2005. On November 8, 2005, it granted a certificate of appealability on the issue of Giglio[1] error.

---

[1] Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Occhicone timely filed an appeal and this case is now properly before us.

## II.  ISSUE

The issue in this case involves an alleged violation of Giglio focusing on the testimony of Baker, a cellmate with Occhicone after the murders of the Artzners. Baker had been paroled from an original grand theft conviction.  While on parole, he committed another grand theft (herein referred to as the "recent grand theft"), was arrested, and shared a jail cell with Occhicone.  Occhicone made an incriminating statement to Baker, about which Baker testified both in a deposition and at Occhicone's trial.   The Giglio issue involved the agreement between the prosecution and Baker for Baker to testify against Occhicone in exchange for the prosecution's recommendation that he receive probation on the recent grand theft charge.   In the state collateral proceedings, the state circuit judge found that Baker's testimony at Occhicone's trial that he did not have a deal with the prosecution with respect to his sentence on the recent grand theft charge was untruthful.  In so concluding, the state circuit judge found that the public record in Baker's recent grand theft case indicated that he did in fact receive probation as a result of his agreement with the State to testify in defendant's trial.  Thus, the issue in the state collateral proceeding, as well as the issue in the instant appeal, boiled down to whether the State's failure to correct this untruthful testimony was material

3

under Giglio.

However, before addressing the Giglio materiality issue, we must determine the scope of our review. Thus, we address first whether the State courts applied the correct standard of materiality, and our inquiry leads us to conduct a de novo review. Then we discuss the precise standard of materiality. Finally, we apply the standard.

## III. DISCUSSION

A.    Was the Florida Supreme Court's Denial of Occhicone's State Habeas Petition Contrary to Clearly Established Law?

In examining a federal district court's denial of a § 2254 habeas petition, we review questions of law *de novo* and findings of fact for clear error. LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1259 (11th Cir. 2005). When examining a state supreme court's denial of a state habeas petition, we ask whether the decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Occhicone contends that the Florida Supreme Court's decision denying his state habeas petition was contrary to clearly established federal law. His state

4

petition maintained that he was denied a fair trial because government witness Phil Baker submitted material testimony that the prosecution knew to be perjured but did not correct. According to Occhicone, the Florida Supreme Court used the wrong standard in assessing the merit of his claim. He claims that it used the United States Supreme Court's general materiality standard for government suppression of exculpatory evidence, rather than the more defendant-friendly standard which applies specifically when the government fails to correct perjured testimony.

Under the first standard, the defendant must establish materiality by proving that there was "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitney, 514 U.S. 419, 433-34, 115 S.Ct. 1555,1565, 131 L.Ed.2d 490 (1995). This is commonly known as the Brady standard, after Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), in which the Supreme Court held that prosecutors have an affirmative duty to disclose exculpatory evidence. Under the second standard, the Giglio standard, the defendant need only show a "reasonable likelihood it affected the judgment of the jury." Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Occhicone maintains that the Florida Supreme Court applied Brady when it

should have used <u>Giglio</u>. In this case, the Florida Supreme Court's discussion of the <u>Giglio</u> issue is cursory. <u>Occhicone v. State</u>, 768 So.2d 1037, 1042-43 (Fla. 2000). It does not cite <u>Giglio</u> but states only that there was no "reasonable probability that the false testimony affected the jury's judgment," language that combines elements of <u>Brady</u> and <u>Giglio</u>. <u>Occhicone</u>, 768 So.2d at 1042. The state lower court did cite <u>Giglio</u> but used the term, "reasonable probability," in its evaluation. <u>State v. Occhicone</u>, No. 86-1355CFAWS, 4-5 (Fla. Cir. Ct. 1996).

A few months after denying Occhicone's state habeas petition, the Florida Supreme Court stated that "[t]he standard for determining whether false testimony is 'material' under <u>Giglio</u> is the same as the standard for determining whether the State withheld 'material' evidence in violation of <u>Brady</u>." <u>Rose v. State</u>, 774 So.2d 629, 635 (Fla. 2000), <u>overruled by</u> <u>Guzman v. State</u>, 868 So.2d 498, 505-08 (Fla. 2003) (stating that its previous decisions had "improperly merge[d]" the two standards and that <u>Giglio</u> was more defense-friendly than <u>Brady</u>). Thus, Occhicone contends that <u>Rose</u>'s interpretation of <u>Giglio</u> was implicitly present in his case as well.

Because it is clear that Baker's testimony is not material even under our <u>de novo</u> review pursuant to the <u>Giglio</u> standard, we will assume <u>arguendo</u> that the Florida Supreme Court applied the wrong standard and then proceed to conduct a

6

de novo review under the proper Giglio standard.

    B.  The Giglio Standard of Materiality

Pursuant to Giglio, false testimony is material "if 'the false testimony could

... in any reasonable likelihood have affected the judgment of the jury.'" 405 U.S.

150, 154, 92 S.Ct. 763, 766 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 79

S.Ct. 1173 (1959)).  Our cases have indicated that the standard is analogous to the

"harmless beyond reasonable doubt" standard of Chapman v. California, 386 U.S.

18, 87 S.Ct. 824 (1967).  Carr v. Schofield, 364 F.3d 1246, 1255 (11th Cir. 2004);

United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995); United States v.

Rivera-Pedin, 861 F.2d 1522, 1529 n.13 (11th Cir. 1988).  In other words, if there is

a reasonable doubt about the effect of the false testimony on the jury verdict, then it

may be that there is a reasonable likelihood that the false testimony could have

affected the verdict.[2]

We note that Ventura raises the question of whether the Chapman gloss on

Giglio is appropriate for habeas cases in light of Brecht v. Abrahamson, 507 U.S.

619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993),which held that for federal collateral

review, the proper harmlessness standard is whether the error had "a substantial

---

[2]    Stated another way, this may be merely an elaboration of the meaning of the Giglio standard – whether there is "any reasonable likelihood [that the false testimony could] have affected the judgment of the jury."  Giglio, 405 U.S. at 154, 92 S.Ct. at 766.

7

and injurious effect or influence in determining the jury's verdict." 419 F.3d at 1279n.4. Because the choice of standards is ultimately irrelevant to the outcome of this case, we will not decide this issue but will assume arguendo that the Chapman gloss is appropriate.

Occhicone argues that the "beyond a reasonable doubt" gloss on the standard that this Circuit has derived from Chapman also indicates that the burden of proof with respect to materiality is on the State, and not on him. We doubt that this is the case. Until a habeas petitioner has proved materiality, no Giglio error, and thus no constitutional violation, has been established. We also note that none of the cases upon which Occhicone relies supports his argument that the prosecution bears the burden of proving materiality in the habeas corpus context. Neither Carr nor Alzate, nor Rivera-Pedin address the burden of proof issue; the latter two cases involve a direct appeal, and therefore could not have addressed the burden of proof in a habeas context. Moreover, the habeas petitioner traditionally bears the burden of demonstrating constitutional error. Romine v. Head, 253 F.3d 1349, 1357 (11th Cir. 2001). By treating the challenged sentence or conviction as valid until proven otherwise, such an arrangement best serves the principles of comity, finality and federalism that undergird federal habeas corpus review.

However, it is unnecessary in this case to decide the burden of proof issue

8

raised by Occhicone. The Supreme Court has observed, with respect to harmlessness inquiries, that consideration of burdens of proof will rarely suffice to determine a case's result: it is "conceptually clearer for the judge to ask directly, 'do I, the judge, think that the error substantially influenced the jury's decision?' than for the judge to try to put the same question in terms of proof burdens." O'Neal v. McAnich, 513 U.S. 432, 436-37, 115 S.Ct. 992, 995 (1995). The Court suggested that, when a judge is evaluating the effect on a jury verdict, the burden of proof is implicated only when the conscientious judge is in grave doubt about the effect on the verdict. Thus, even assuming arguendo that Occhicone did not have the burden of proof with respect to materiality, we must leave his sentence and conviction intact because, for the reasons below, we have no grave doubt about their propriety.

C. Application of the Standard

At trial, Occhicone relied on a defense of voluntary intoxication to claim that he did not have the requisite intent and thus that he was not guilty of capital murder. Baker was one of several prosecution witnesses whose testimony was relevant to intent and premeditation. Baker, an ex-convict who had been arrested recently on grand theft charges, shared a jail cell with Occhicone after the murder of the Artzners. Occhicone told Baker that he should have killed the Artzners

9

earlier, and that he only regretted not also killing their daughter and his ex-girlfriend, Anita Gerrety. Baker reported Occhicone's statement to the jury but denied that he was testifying in exchange for the prosecution's agreement to recommend leniency with respect to his sentence on the recent grand theft charges. The State circuit court found that, contrary to Baker's testimony, there was a deal that in return for his agreement to testify, prosecutors would recommend that he receive probation on the recent grand theft charge. State v. Occhicone, No. 86-1355CFAWS, 4 (Fla. Cir. Ct. 1996).

Thus, the State circuit court implicitly found that Occhicone had satisfied the first hurdle in establishing a Giglio violation – i.e., that the State failed to correct Baker's untruthful testimony. Occhicone asserts that he has also established the second prong, materiality, because the jury would have had reason to discount Baker's credibility, had the State corrected Baker's untruthful testimony. For several reasons, we reject Occhicone's argument. Our de novo review persuades us that there is no reasonable likelihood that the State's failure in this regard could have affected the verdict. To evaluate the significance of the challenged testimony on the verdict, we first examine its context – i.e., the jury's understanding of the entirety of the prosecution's arrangements with Baker – and then evaluate same in light of the totality of the evidence.

As noted earlier, Baker had been convicted of an original grand theft charge, had served his time, and been paroled. While on parole, he committed another grand theft (herein referred to as the "recent grand theft"), was arrested therefor, and was incarcerated in the same jail and in the same cell with Occhicone. During this shared jail time, Occhicone made the incriminating statement to Baker. Baker at this point had two impending criminal justice events, both of which carried the potential for additional jail time: (1) his potential conviction and sentence on the recent grand theft charge, and (2) the potential revocation of his parole by the parole board on his original grand theft conviction.

With respect to the first of these, Baker testified at trial that he and the State did not have any deal worked out regarding Baker's case in exchange for his testimony against defendant. It is this testimony with respect to Baker's sentence on the recent grand theft charge that the State circuit court found was untrue, concluding that Baker received a sentence of probation on this recent grand theft charge because of his agreement with the State to testify in Occhicone's trial. By the time of Occhicone's trial, Baker had already been sentenced to probation on this recent charge, and this fact was known to the jury.

With respect to the second criminal justice event that Baker was facing – the potential revocation of his parole on the original grand theft charge – Baker also

11

had an arrangement with the prosecution that in exchange for his testimony against Occhicone, he was to get a favorable recommendation from the State as to his parole. However, as discussed below, this arrangement with the State was presented to and known by the jury.

At his deposition, Baker testified with respect to his arrangement with the State concerning the potential revocation of his parole relating to the original grand theft charge. He testified that he was expecting the prosecutors to give him a favorable recommendation before the parole board. In Baker's testimony at the actual trial, he also testified that it was his understanding that, in exchange for his testimony here today, he was going to get a favorable recommendation from the State as to his parole. This admission – i.e., in exchange for his testimony, he was to receive a favorable recommendation as to his parole – put the jury on notice of the incentive Baker might have to provide untruthful testimony. We also note that the parole board hearing had not yet occurred at the time of Baker's testimony at Occhicone's trial. Thus, the significance of the arrangement with the State – i.e., its tendency to induce Baker to bend his testimony in favor of the State – is enhanced as compared to the significance of Baker's arrangement with respect to his sentence on the recent grand jury charge, because the latter sentence had already been imposed, and Baker had already received probation thereon, all of

12

which was known to the jury.

The foregoing discussion reveals that Baker's testimony was subject to impeachment by virtue of two arrangements or deals with the prosecution, and that the more significant of the two was well known to the jury. Further undermining the significance of the deal about which the jury was not fully aware are two additional facts. First, the jury did know that Baker had already received probation on that charge, the recent grand theft charge. Second, at the time of trial, the defense was already aware that there probably was a deal with respect to the recent grand theft charge also. At his deposition, Baker had testified not only that he was expecting a favorable recommendation before the parole board, but he also testified that he was expecting a recommendation of probation on his recent grand theft charge. Had the defense at trial thought this fact would have great significance, or that Baker had not been fully impeached with respect to his incentive to favor the prosecution, the defense surely would have cross-examined Baker to emphasize his prior inconsistent testimony that he was expecting probation on the recent grand theft charge.[3]

---

[3] We also note that the testimony about the arrangement with respect to the recent grand theft charge – the testimony that the state circuit judge found untruthful – was fleeting. Baker merely answered "no" to a question by the attorney. We also note that the prosecutor did not mention this untrue fact in his argument to the jury. On the other hand, the defense did emphasize both the fact that Baker got probation on the recent grand theft charge and also the fact that he had a deal with the prosecution with respect to his parole on the original grand theft

13

Having examined the context of the untruthful statement which the State failed to correct (and its significance thereof), we turn our attention to the significance of same in light of the totality of the evidence. We conclude that there was very strong evidence of Occhicone's intent and premeditation. Baker was only one of five witnesses who had heard Occhicone talk about killing the Artzners. In the months prior to the shooting, Occhicone spent a considerable portion of each day at a local bar. The owner and two bartenders, all working separate shifts, testified that in the weeks immediately preceding the murder, Occhicone told them he was distraught at the failure of his relationship with Anita Gerrety and wanted to kill the Artzners.[4] In addition, Anita Gerrety testified that "[o]n numerous occasions, he would say that he would take those that were closest to me, meaning my parents and children, and blow them away starting with [their] kneecaps and working his way up and leaving me for the last so I could watch."

In addition, there is strong evidence of intent and premeditation in the

_____

charge.

[4] About seven to ten days before the shooting, Occhicone told Lily Lawson that he "felt like shooting [Gerrety's] father and making her watch, and her mother and making her watch, and shooting her kids and making her watch."

Two weeks before, he told Cheryl Hoffman that "he wanted to kill [Gerrety's] parents. He wanted to torture and kill her children and make her watch, but he didn't want to kill her, he just wanted to wound her for life."

Two to three weeks before, he told William Michael Anderson that he wanted to "blow [the Artzners] away."

14

uncontested account of the moments leading up to the murder. In the early morning, Occhicone arrived at the house where the Artzners, Gerrety and her children lived. He knocked on Gerrety's bedroom window, but she refused to talk to him. An hour later, he returned with a gun. He cut the phone lines to the house, and then, after being confronted by Mr. Artzner, shot him. He then broke into the house where he shot Mrs. Artzner as well. His decisions to return to the home with a lethal weapon, and to cut the phone lines, are strong evidence that the murders were the result of a premeditated intent.

Occhicone argues that Baker's testimony was critical to his conviction, because nearly all of the other witnesses, he argues, heard him when he was intoxicated, and the only other exception beside Baker is Anita Gerrety, the victims' daughter. It is true that Occhicone was drinking when he related his various threats and intentions to those witnesses. And it is true that Gerrety presumably had a personal interest in the consequences of her testimony. But even so, the fact remains that in the weeks leading up to the murder, Occhicone told at least four different people that he wanted the Artzners dead. The number of statements, their consistency, their persistence over a significant time, and their proximity to the date of the murder, combined with the undisputed account of the Artzners' murder, provide strong evidence of premeditation and intent to make

15

Baker's testimony superfluous.

In summary, we conclude that the significance of the untruthful testimony found by the state court is seriously undermined by the following factors: the fact that the jury was well aware of the more significant of the two arrangements which Baker had with the State, in exchange for his testimony against Occhicone, thus amply informing the jury of Baker's motive to testify in favor of the State; the fact that , even with respect to the arrangement of which the jury was not aware, the jury did know that Occhicone had already received probation with respect to that charge; and finally, the fact that there was very strong evidence of intent and premeditation other than that offered by Baker.  In light of the totality of the evidence, our <u>de novo</u> review persuades us that there is no reasonable likelihood that the state's failure to correct the untruthful testimony in this case could have affected the judgment of the jury.


## III.  CONCLUSION

For the foregoing reasons, the judgment of the district court denying Occhicone's petition for writ of habeas corpus is

AFFIRMED.