[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-12268

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MONTY RAY GROW,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cr-20893-FAM-1

_____

Before GRANT, LUCK, and BRASHER, Circuit Judges.

PER CURIAM:

A jury convicted Monty Grow of defrauding a government health insurance program that served military personnel and their families.  In his initial appeal, we affirmed Grow's convictions and sentences—except as to Grow's sentence for one count.  On remand, the district court lowered Grow's sentence from 262 months to 156 months.  Grow appeals again, arguing that the district court erred in (1) denying his new trial motion, (2) repackaging his sentence, and (3) ordering him to forfeit substitute assets.  We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### The Indictment

In November 2016, a grand jury indicted Grow for healthcare fraud.  The government later charged Grow in a superseding indictment with the following counts:

- Count 1:  conspiracy to commit healthcare fraud and wire fraud, in violation of 18 U.S.C. section 1349;

- Counts 2–8:  healthcare fraud, in violation of 18 U.S.C. section 1347;

- Count 9:  conspiracy to pay and receive healthcare kickbacks, in violation of 18 U.S.C. section 371;

- Counts 10–14, 17–18, 20, 22–26, 28–33:          receipt          of
  kickbacks in connection with a federal healthcare pro-
  gram, in violation of 42 U.S.C. section 1320a-7b(b)(1)(A);

- Counts 36–41, 43–44: payment of kickbacks in connection
  with a federal healthcare program, in violation of 42
  U.S.C. section 1320a-7b(b)(2)(B);

- Counts 45–49:   money laundering, in violation of 18
  U.S.C. section 1957; and

- Counts 50–51:   misbranding drugs, in violation of 21
  U.S.C. sections 331(k) and 333(a)(1)

### The Trial

The case went to trial in January 2018.  In its opening state-
ment, the government explained that Grow "participated in a
scheme to defraud Tricare tens of millions of dollars."  Tricare was
a "[f]ederal health care program that provide[d] insurance" to mil-
itary personnel and their families.  Grow "came up with a pyramid
scheme of kickbacks" to recruit and induce Tricare beneficiaries to
order "expensive drugs that they didn't need."  In other words,
Grow's scheme involved paying patients money to obtain expen-
sive prescriptions that they didn't need.  Grow made almost
$20 million from the scheme.

In response, Grow's lawyer opened by explaining that Grow
was a former National Football League player who became a
"salesperson" and a "marketer" after he was sidelined by an injury.

The company Grow ran was not a "pyramid scheme" but a "multi-level marketing company." Grow's lawyer told the jury that the case would be "about intent." He said that Grow "had one rule: The patients must need the product." To the extent that recruits received medicine they didn't need, Grow's lawyer contended that those recruits were "outliers" and that "mistakes . . . were made."

The government then presented its case. The first witness was Ginger Lay. Lay began by stating that she was testifying because of a "crime [she] committed . . . [w]ith Monty Grow." She explained that she entered into a "plea agreement" with the government that required her "to cooperate, to be truthful and submit documentation." She admitted that she hoped to get a reduction in her sentence by testifying, and that she understood that she "wouldn't be able to get a reduction" if she lied on the stand.

Lay then described the scheme, explaining that Grow recruited her to sell prescriptions for scar creams, pain creams, and vitamins—that costed up to $17,000 per prescription. She would receive forty percent of the profits from the prescriptions she sold (minus the costs of goods and telemedicine). The scheme, she explained, involved "find[ing] Tricare beneficiaries, sign[ing] them up for compounded medications, submit[ting] the prescription to the telemedicine doctor, hav[ing] it sent to the pharmacy[,] and get[ting] paid commissions."

While questioning Lay, the government walked through documentary evidence. The government presented, for example, a check Grow paid Lay for her first two weeks of work. The check

showed that Lay made about $130,000 for about fifteen hours of work.  The government also introduced an email in which Grow told Lay to "[a]lways use p-01 for pain and s[c]-01 for scar."  Those codes corresponded to medications with the "highest reimbursement" rates.  In another email, Grow instructed one of the telehealth companies to change a prescription that was already signed.  In a text message to Lay, Grow also wrote that a patient was "refusing meds because of copays" but that Lay should "work[] something out with him" by telling him that "[h]e doesn't have to pay" for the medications and that "[t]hey won't try to collect."

Lay also testified about two emails (both admitted into evidence) that a pharmacist sent to Grow.  In the first, the pharmacist asked Grow:  "Whose fax number is this?  We cannot show outside fax numbers on these prescriptions.  There is a HIPAA concern around unsecured pathways and patient brokering concerns when speaking around scripts not coming directly from the doctor."  In the second, the pharmacist told Grow:  "Cannot have MD to you to us trail."  According to Lay, these emails aligned with Grow's instructions to her to "white-out [their] fax number when the doctors faxed [prescriptions] to [her] and [then] fax[] [them] into the pharmacy" so that it "look[ed] like [the prescriptions] came from the doctor and not me and not us."

The defense cross-examined Lay.  In doing so, the defense highlighted Lay's plea deal:  that she was charged "together" with Grow; that "there were many, many charges" against her; that she "could have been facing more than [ninety] years in prison"; that

she pleaded "guilty to one count of health care fraud"; and that, as a result, "the most [she could] get [was] [ten] years." Lay also admitted that she'd met with the prosecution more than once, that her "cooperation" was part of her deal, and that she provided hundreds of pages of documents to the government.

The government presented fifteen or so more witnesses—and witness after witness told a similar story. For example, Philip Snodgrass testified that he was "approached" by someone who asked him to participate in a "trial" for pain cream where he "would be given $100 a month." Snodgrass testified that he wasn't looking for a pain cream, scar cream, or vitamins when one of Grow's representatives called him. Instead, he got the creams and vitamins because he was promised money.

Nichole Powell testified that Grow recruited her to "get[] other people to get products; pain cream, scar cream and vitamins." She "signed up" for the products herself even though she "didn't need the drugs." Grow told her it was simply "a way to make money." Powell received some of the drugs before she spoke to a doctor. Powell also had her husband sign up for the medications. Grow paid her a $54,000 commission for her work. Powell testified that she knew she was doing something wrong "[d]eep down inside."

Jill Cichowicz explained that Grow told her about the creams and said that "everybody could use vitamins." Grow also told Cichowicz that she "would receive a commission based on [her] prescription." In Cichowicz's words, she "got paid to do

nothing." When she received a $1500 payment in her account for her first order, a "red flag . . . went up right away."

Sven Bjerke also "got paid [by Grow] to recruit patients that had Tricare." He explained that, because of this arrangement, he pleaded guilty to "receiving kickbacks." Grow told him to select "auto refills . . . so [they] could get more money." Grow also explained that he "wouldn't collect a copay if they didn't want to pay for it." Bjerke would fill out patient intake forms and send them to Grow. Grow (and an affiliated pharmacy) paid Bjerke about $110,000 for six months of work. This more than doubled his annual salary for his normal job.

Robin Halliburton testified that she "was charged with conspiracy to receive [a] kickback." She testified that she conspired with Grow to "[r]ecruit[] Tricare patients." Halliburton explained that she "target[ed] Tricare beneficiaries" and "got paid for each patient that [she] brought to Mr. Grow." Grow told her to tell patients "not to worry" about copays. After Halliburton recruited her first couple of patients, she emailed Grow to ask if she did everything right. Grow responded: "Yes, you are good to go." He then explained: "If your two go through as expected, your [seven] percent [payment] will be approximately $4,000 every month that they get their script filled." Halliburton said that she thought this amount of money was "too good to be true" and knew it was "wrong," but that she did it anyway "[o]ut of greed."

The defense also put on a case and Grow took the stand. Grow testified that he played in the National Football League until

a knee injury ended his career. At that point, he entered the healthcare space. Eventually, he created his own company—the one at the center of this case—which grew to about 130 representatives and 650 patients. Grow testified that he didn't know how some representatives came to be "paid on their own prescriptions." He also said that "[n]obody was . . . trying to bribe" anyone to buy medications. Grow claimed that he had no idea that Lay was "offering patients a thousand dollars to receive prescriptions." And he said that he had "no intention of violating" any law.

On cross examination, Grow conceded that he never hired a lawyer to ensure he was complying with relevant laws. Grow also acknowledged that it was illegal to pay patients. And he said that, while some representatives were paid for signing *themselves* up for medications, that "was an accident." Grow told the jury that, when he found out that Lay might be paying patients, he shut down her payment program. At the same time, Grow said that he didn't fire Lay because she "was very convincing in letting us know that no one had ever been paid." Grow admitted that some of his prescriptions sold for "99 percent profit," and he said that he made about $13,500 per month on patients who ordered pain cream, scar cream, and vitamins. Grow agreed that he obtained about $19 million through the scheme.

In rebuttal, the government called Jonelle Coronado. Coronado testified that Grow recruited her. While Grow had just told the jury that he never paid any patient, Coronado testified that Grow told her on a call that, "if [she] signed up under him," she

21-12268                  Opinion of the Court                      9

"would receive the products and then [she] would also get a commission from even [her] own products." Grow said that, "if [she] liked them," Coronado could also sell them to her "other Tricare friends." Coronado agreed to buy the products for herself—and, in return, received a $1800 payment. Eventually, Coronado decided to stop ordering the prescriptions because she "felt like [she] had gotten a large amount of money . . . for doing nothing."

After a seven-day trial, the jury convicted Grow of conspiracy to defraud Tricare, substantive healthcare fraud, conspiracy to pay and receive healthcare kickbacks, thirteen counts of receiving healthcare kickbacks, and money laundering.[1] He was acquitted on the remaining counts.

### Post-Trial Proceedings

The district court sentenced Grow to 262 months' imprisonment and three years of supervised release. The district court also ordered $18,856,744 in restitution and later entered an order of forfeiture based on the jury's finding that Grow "received (or obtained) $18,856,744" from his offenses.

Grow appealed his conviction and sentence.[2] We affirmed his conviction on all counts. *United States v. Grow*, 977 F.3d 1310 (11th Cir. 2020). But we vacated Grow's sentence for count one

---

[1] Those were Counts 1, 5, 9, 10–14, 17–18, 20, 22, 23–26, and 45.

[2] Grow also appealed the order of forfeiture but abandoned that challenge on appeal.

(conspiracy to defraud Tricare) because the jury only returned a general verdict for count one—and so the verdict didn't reveal whether his sentence for count one could be 240 months (for wire fraud) or 120 months (for healthcare fraud). *Id.* at 1330–31. We explained that, "[o]n remand, the district court must permit the government to either consent to resentencing based on a maximum sentence of ten years on count one or elect to retry Grow on count one with a special verdict." *Id.* at 1331. We "remand[ed] for proceedings consistent with [our] opinion." *Id.*

Rather than retrying the case, the government chose to proceed to resentencing. At resentencing, the parties agreed that the recalculated guidelines range was 188 to 235 months. Grow argued that the sentencing package doctrine didn't apply and so his sentence should be 144 months' imprisonment. The government argued that the sentencing packaging doctrine did apply and that Grow's sentence should be 235 months. The district court concluded that it had the authority to "repackag[e]" Grow's sentence after this court vacated part of his sentence and so it could resentence Grow on each count. And it sentenced Grow to 156 months' imprisonment.

While Grow's appeal was pending, the government moved for a first final forfeiture order. Grow did not respond. Five weeks later, the district court granted the first final forfeiture order, transferring $1,680,922 and a Porsche to the government. Later, the government moved (unopposed) for forfeiture of substitute assets. The district court granted the motion without objection. During

resentencing proceedings, the government moved for a second order requiring forfeiture of substitute assets. The district court granted the motion. When substitute forfeiture later came up at a hearing, defense counsel said there was "nary an objection from the defense" and that "there's not going to be one."

After we remanded this case to the district court, Grow also moved for document production, an evidentiary hearing, and a new trial because of alleged *Brady* and *Giglio* violations. Grow argued that three facts about Lay had recently surfaced. First, although Lay testified at her change of plea hearing that she had no prior criminal record, she had, in fact, been convicted of a misdemeanor. Second, Lay also testified at her plea hearing that she hadn't been to a "psychiatrist or a mental institution," but she had actually been housed in a psychiatric facility after attempting suicide as a child. Third, Lay had cooperated against others besides Grow.

The government, for its part, argued that Grow's motion should be denied. As to the misdemeanor, it argued that it did disclose her conviction to the defense, that Lay did not lie at her change of plea hearing, and that there was no prejudice in any event. As to Lay's mental health history, the government asserted that it didn't know about it and that it was not obligated to disclose that information. As to Lay cooperating against others besides Grow, the government explained that it disclosed that Lay was a cooperating witness and turned over all of her interview reports which identified any potential targets.

The district court denied Grow's motion for document production, an evidentiary hearing, and a new trial. The district court found that "there [was] no reasonable probability that the outcome—a guilty verdict—would have been different" if the evidence had been disclosed. "Grow," the district court explained, "testified at the trial and neither the jury nor the [c]ourt believed his testimony." "Therefore, even if one of the able defense attorneys would have been allowed . . . to cross-examine" Lay about her prior misdemeanor and her mental health, "the verdict would still be guilty." Thus, none of the evidence "undermine[d] confidence in the verdict."

## STANDARD OF REVIEW

"We review de novo alleged *Brady* or *Giglio* violations." *United States v. Stein*, 846 F.3d 1135, 1145 (11th Cir. 2017). "We review the district court's denial of a motion for new trial for an abuse of discretion." *Id.* We also review for abuse of discretion "the district court's decision not to hold [an evidentiary] hearing and compel discovery." *Id.* at 1151. And we review de novo the scope of the district court's authority to resentence a defendant under the sentencing package doctrine. *See United States v. Watkins*, 147 F.3d 1294, 1296 (11th Cir. 1998).

## DISCUSSION

Grow advances three arguments on appeal. First, Grow argues that he is entitled to a new trial—or at least an evidentiary hearing and discovery—for the government's *Brady* and *Giglio*

violations. Second, Grow contends that the district court erred by repackaging his sentence. Third, Grow asserts that the district court erred in ordering substitute forfeiture. We take these arguments in turn.

## The New Trial Motion

The district court properly denied Grow's motion for document production, an evidentiary hearing, and a new trial. Grow failed to show that the government violated *Brady* or *Giglio*. And he has not shown that the district court abused its discretion in denying discovery or an evidentiary hearing.

### Brady

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87. To show a *Brady* violation, a defendant must establish that:

> (1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different.

14                    Opinion of the Court                    21-12268

*United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002). "The burden to show a *Brady* violation lies with the defendant, not the government." *Stein*, 846 F.3d at 1145 (cleaned up).

To meet the fourth element (materiality), a defendant must show that "the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict." *Hammond v. Hall*, 586 F.3d 1289, 1306 (11th Cir. 2009) (quotation omitted); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." (quotation omitted)).

In this case, Grow contends that the government violated *Brady* by failing to disclose that Lay (1) committed a misdemeanor, (2) suffered from mental health problems as a child, (3) was cooperating against others, and (4) perjured herself at her plea hearing by failing to disclose her misdemeanor and mental health issues.[3] But this the evidence does not "undermine confidence in the guilty verdict." *Hammond*, 586 F.3d at 1306 (quotation omitted). The

---

[3] On appeal, Grow argues for the first time that the government also failed to disclose that "the government had, due to [Lay's] cooperation, agreed not to pursue a mandatory forfeiture of $6.3 million." But the government simply decided to forgo forfeiture in favor of restitution. Lay earned $6.3 million when working for Grow. And the government obtained a $6.3 million restitution order against Lay. The government also obtained multiple orders garnishing her assets and recovering substantial funds. Grow's accusation of a $6.3 million "payoff" falls flat.

government presented a compelling case. It presented emails and text messages in which Grow told his employees to "[a]lways" select drugs with the highest reimbursement rates and to tell patients that they wouldn't "have to pay" copays. In another email, Grow instructed a telehealth company to change a prescription that was already signed by a doctor. And in two other emails, a pharmacist warned Grow that they "[c]annot have MD to you to us trail."

On top of that, the government presented staggering financial gains—rewards that Grow's employees testified were "red flag[s]" and "too good to be true." And each witness told the same story: that Grow and his associates recruited them to buy and sell unnecessary medications for cash. Grow also chose to take the stand and in doing so made a case against himself. In the district court's words, "Grow testified at the trial and neither the jury nor the [c]ourt believed his testimony." Indeed, after Grow told the jury that he'd never paid a patient, Jonelle Coronado testified (in rebuttal) that Grow *personally* told her that she would "get a commission" for ordering medications for herself.

The evidence Grow now points to—evidence that impeaches Lay—also adds little to what he already presented at trial. Grow's counsel cross-examined Lay at length, highlighting that she had a strong incentive to lie to minimize her own sentence. To that end, the defense established that "there were many, many charges" against Lay; that she "could have been facing more than [ninety] years in prison"; that she pleaded "guilty to one count of health care fraud"; and that, as a result, "the most [she could] get

[was] [ten] years." Indeed, Lay admitted that she was hoping to get a sentence reduction by testifying in this case. A few more (unconvincing) pieces of impeachment evidence wouldn't have changed the jury's verdict.

In sum, Lay was a single witness who testified over the course of a weeklong trial. The trial presented compelling evidence of guilt—including Grow's own hard-to-believe testimony. We agree with the district court that Grow, on these facts, failed to establish any *material* nondisclosure under *Brady*.

## Giglio

In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court held that the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with" due process. *Id.* at 153. "*Giglio* error, a species of *Brady* error, occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." *Stein*, 846 F.3d at 1147 (quotation omitted). "*Giglio* also applies where the prosecutor herself made explicit factual representations to the court or implicit factual representations to the jury, knowing that those representations were false." *Id.* (quotation omitted).

"To prevail on a *Giglio* claim, a petitioner must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable

likelihood that the false testimony *could have* affected the judgment." *Ford v. Hall*, 546 F.3d 1326, 1331–32 (11th Cir. 2008) (cleaned up). "The could have standard requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011) (quotation omitted).

Grow argues that the government violated *Giglio* in making two statements in its closing. First, the government told the jury that "[e]ach of the witnesses that pled guilty and accepted responsibility for their actions told you that they knew what perjury is and what the consequences could be if they lied under oath." Second, the government said: "And who has the most incentive to lie? Monty Grow." According to Grow, these statements were false because Lay committed perjury at her plea hearing and because Lay had the greatest incentive to lie to preserve her plea deal.

We disagree. For starters, it's hard to see how either of the government's statements were false. As to Lay's understanding of perjury, Lay *did* testify that she understood perjury and the consequences of lying on the stand. As to incentives, Grow did have the most to lose during *his* trial. So Grow hasn't shown that the government offered any false statement. *See Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1313 (11th Cir. 2005) ("In the *Giglio* context, the suggestion that a statement may have been false is simply insufficient; the defendant must conclusively show that the statement was actually false.").

But even if Grow *had* shown a false statement, there is no "reasonable likelihood that the false [statement] could have affected the judgment" of the jury. *Stein*, 846 F.3d at 1149. As the district court explained, there was "a significant amount of evidence . . . presented at trial against the defendant." Witness after witness testified that Grow recruited them as part of a scheme to pay patients to obtain unnecessary medications. Grow also "testified himself" and the jury "did not believe him." In light of the overwhelming evidence against him, there's no reasonable likelihood that the government's statements could have affected the jury's judgment. *See Occhicone v. Crosby*, 455 F.3d 1306, 1311 (11th Cir. 2006) ("To evaluate the significance of the challenged [statement] on the verdict, we . . . [must] evaluate [the statement] in light of the totality of the evidence.").

Because Grow didn't show that the government's statements were false—and because the statements were immaterial in any event—the district court properly found no *Giglio* violation.

### An Evidentiary Hearing and Discovery

Grow also "failed to show [that] the district court's decision not to hold [an evidentiary] hearing and compel discovery was an abuse of discretion." *Stein*, 846 F.3d at 1151. Grow's evidence is immaterial and so an evidentiary hearing would not further his claim. *See Clark v. Att'y Gen., Fla.*, 821 F.3d 1270, 1291 (11th Cir. 2016) (affirming the denial of an evidentiary hearing on a *Brady* claim because the evidence was "not material").

*Sentencing Package Doctrine*

The district court properly resentenced Grow on remand. "A criminal sentence in a multi-count case is, by its nature, a package of sanctions that the district court utilizes to effectuate its sentencing intent consistent with the sentencing guidelines and with the section 3553(a) factors." *United States v. Fowler*, 749 F.3d 1010, 1015 (11th Cir. 2014) (cleaned up). Thus, under the sentencing package doctrine, when a conviction or sentence "on one or more . . . counts is vacated," a district court is generally "free to reconstruct the sentencing package . . . to ensure that the overall sentence remains consistent with the guidelines, the [section] 3553(a) factors, and the [district] court's view concerning the proper sentence in light of all the circumstances." *Id.*

The district court initially sentenced Grow to 262 months. In crafting its sentence, the district court explained that "white-collar crime" is a "thinking crime" that is particularly susceptible to deterrence. It also pointed to Grow's "lack of remorse," his enormous financial gains, his "leadership role," and the harm he inflicted on "military families." When this court later vacated Grow's sentence for count one, the district court was "free to reconstruct [Grow's] sentencing package" on remand to achieve an appropriate sentence. *Id.* That's exactly what the district court did here by

reassessing Grow's entire sentence—including the counts we affirmed—to reach a sentence of 156 months.[4]

Grow concedes as much but argues that our limited mandate prohibited the district court from revisiting anything other than count one. Not so. We've held that it is "*presumed* that sentences on each count of a multi-count indictment are part of a package that may . . . be revisited" at resentencing. *Id.* at 1017 (emphasis added). And we said nothing in Grow's first appeal to disturb that presumption. In particular, we instructed that, "[o]n remand, the district court must permit the government to either consent to resentencing based on a maximum sentence of ten years on count one or elect to retry Grow on count one with a special verdict." *Grow*, 977 F.3d at 1331. Once the government chose resentencing, nothing barred the district court from repackaging Grow's sentence. There's no error here.

---

[4] The district court reached Grow's original sentence of 262 months by sentencing Grow to: 240 months on Count 1, 22 months on Count 5 to be served consecutively, and 60 months each on Counts 9-14, 17, 18, 20, 22-26, and 45 to be served concurrently. The district court resentenced Grow to 156 months' imprisonment on remand by sentencing Grow to: 120 months on Count 1, 36 months on Count 5 to run consecutively, and 60 months each on Counts 9-14, 17, 18, 20, 22-26, and 45 to be served concurrently. In other words, the district court repackaged the sentence by lowering Count 1 to 120 months and raising Count 5 to 36 months.

### Forfeiture of Substitute Property

Grow's final contention is that the district court erred in ordering him to forfeit substitute assets (like boats, cars, and real estate) to satisfy the money judgment against him. This argument fails because Grow waived it before the district court. "[W]aiver is the intentional relinquishment or abandonment of a known right." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004)).

Grow waived his challenge to the district court's substitute-asset forfeiture orders for three reasons. First, the district court entered a forfeiture order for $18,856,744 that allowed the government to "file a motion . . . to amend [the order] so as to substitute property" to satisfy the order. While Grow later appealed this forfeiture order (along with his conviction and sentence), he abandoned his challenge to the forfeiture order on appeal. Second, the government moved for the forfeiture of substitute assets more than once—and Grow *never* responded or objected. Nor did he ever move for reconsideration after the district court granted those motions. Third, while appearing before the district court, Grow's counsel stated that "[f]reedom is more important to [Grow]"—and so there "was nary an objection from the defense" to the substitute-asset forfeiture order and "there's not going to be one."

As a result, Grow "affirmatively and intentionally relinquishe[d]" his challenge to the district court's substitute-asset forfeiture orders. *Id.*

22                          Opinion of the Court                     21-12268

AFFIRMED.